UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) ) *Plaintiff*, ) ) v. ) ) SCHNITZER STEEL INDUSTRIES, INC., ) ) *Defendant.* ) | Civil Action No. 1:22-cv-10604 |

**UNITED STATES' CONSENTED-TO MOTION TO ENTER
CONSENT DECREE WITH INCORPORATED MEMORANDUM OF LAW**

Plaintiff, the United States of America, on behalf of the United States Environmental Protection Agency ("EPA"), respectfully submits this consented-to motion to enter the proposed Consent Decree, Dkt. No. 2-1 ("Consent Decree," "Decree," or "CD").  The Decree has been approved and signed by all parties.  The Decree was lodged with the Court on April 22, 2022.  Dkt. Nos. 2 (Notice of Lodging).

Consistent with 28 C.F.R. § 50.7, the Decree provides for a 30-day public comment period.  CD ¶ 83.  On April 27, 2022, the United States published a notice of lodging in the *Federal Register*, 87 Fed. Reg. 25045-46 (April 27, 2022), which triggered the commencement of the public comment period.  The comment period closed on May 27, 2022.  No comments were received.  Further, the Defendant, Schnitzer Steel Industries, Inc. ("Schnitzer" or "Defendant") has consented to its entry.  CD ¶ 83.

Because the Consent Decree is fair, reasonable, and consistent with the purposes of the Clean Air Act ("CAA"), under which it was filed, the United States requests that the Court sign the Decree on page 33 and enter it as a final judgment.

## I. BACKGROUND

### A. Statutes and Regulations

Title VI of the CAA, titled "Stratospheric Ozone Protection" and codified at 42 U.S.C. §§ 7671-7671q, mandates the phase-out of substances that deplete the ozone layer. Those substances include refrigerants such as chlorofluorocarbons ("CFCs") and hydrochlorofluorocarbons ("HCFCs"). 42 U.S.C. §§ 7671a(a)-(b). Section 608(a)(2) of the CAA requires that EPA promulgate regulations governing the use and disposal of these substances during service, repair, or disposal of certain appliances. 42 U.S.C. § 767lg(a)(2). The statute defines "appliance" as "any device which contains and uses a class I or class II substance as a refrigerant and which is use for household or commercial purposes, including any air conditioner, refrigerator, chiller, or freezer." 42 U.S.C. § 7671(1). The regulations promulgated under the statute are titled "Recycling and Emissions Reduction Regulations" and codified at 40 C.F.R. Part 82, Subpart F.

The refrigerants contained in appliances subject to Subpart F include CFCs, HCFCs, and hydrofluorocarbons ("HFCs"), which are newer "substitute" refrigerants for CFCs and HCFCs. *Id.* These substances are potent greenhouse gases, some with global warming potentials over 10,000 times that of carbon dioxide ("$CO_2$").[1] CFCs and HCFCs are also ozone-depleting substances that have been or are being phased out of production and use worldwide under the Montreal Protocol.[2] The production and use of HFCs are also being phased down. *Id.*

---

[1] *See* EPA, "Ozone-Depleting Substances," currently available at www.epa.gov/ozone-layer-protection/ozone-depleting-substances (listing ozone-depleting substances and their global warming potentials).

[2] *See* UN Environment Programme, Ozone Secretariat, "Handbook for the Montreal Protocol on Substances that Deplete the Ozone Layer (14th ed., 2020), currently available at

The regulations at 40 C.F.R. § 82.155(b) require that final processors—persons, including scrap recyclers, who take the final step in the disposal process of a small appliances (e.g., refrigerators, freezers, window air conditioners, dehumidifiers, chillers, coolers, and vending machines), motor vehicle air conditioners ("MVACs"), or MVAC-like appliances—must either: (1) recover any remaining refrigerant from the appliance in accordance with 40 C.F.R. § 82.155(a); or (2) verify, using a "signed statement" or "contract," that all refrigerant remaining in the appliance has been recovered under 40 C.F.R. § 82.155(a). 40 C.F.R. § 82.155(b). If the final processor relies on a signed statement, the statement must include the name and address of the person who recovered the refrigerant and the date of such recovery. *Id.* § 82.155(b)(2). If the final processor is relying on a contract with the supplier, the contract must either state that the supplier will (a) recover any remaining refrigerant from the appliance(s) prior to delivery under 40 C.F.R. § 82.155(a), or (b) verify that the refrigerant had been properly recovered prior to receipt by the supplier. *Id.* It is a violation of this regulation for a final processor to accept a refrigerant recovery statement or contract that the processor "knew or had reason to know" was false. *Id.* § 82.155(b)(2)(i).

B. **Complaint**

The United States' Complaint (Dkt. No. 1) alleges that Schnitzer owns and operates 40 scrap metal recycling facilities in the United States and Puerto Rico, where it collects scrap metal appliances from other companies and individuals. Compl. ¶¶ 2, 11, 12. The appliances Schnitzer recycles are crushed, shredded, baled, separated, and sorted into metal and non-metal

---

www.ozone.unep.org/sites/default/files/Handbooks/MP-Handbook-2020-English.pdf (discussing Montreal Protocol, including phase-out of CFCs and HCFCs and phase-down of HFCs).

components. *Id.* ¶ 14. A large portion of Schnitzer's business is recycling items containing iron, "ferrous" materials, primarily steel, including small appliances and MVACs. *Id.* ¶ 2. Schnitzer processes most ferrous materials in a "shredder," which shears and chops large items, such as whole cars and appliances, into small pieces that can be more easily sorted into grades and types of metal, and transported for recycling. *Id.* ¶ 14. Small appliances and MVACs contain refrigerants that, if not captured and disposed of properly before an item is shredded or otherwise processed for recycling, are released into the atmosphere and contribute to depletion of the earth's stratospheric ozone layer. *Id.* ¶ 15.

EPA inspected twelve of Schnitzer's facilities in five states, including Massachusetts. Compl. ¶¶ 18-50. During these inspections, EPA observed instances where Schnitzer (1) accepted appliances that still contained refrigerant, but did not recover the refrigerant prior to the appliances' disposal; (2) accepted appliances that no longer contained refrigerant, but used verification forms that did not contain required information about prior refrigerant recovery; or (3) accepted appliances that no longer contained refrigerant from suppliers that had asserted in statements or contracts that refrigerant had been, or would be, recovered properly prior to their delivery to Schnitzer, but where the inspectors observed evidence that Schnitzer knew or should have known that such assertions were false. *Id.* The Complaint alleges that Schnitzer's failure to comply with the CAA resulted in ozone-depleting refrigerant being released to the atmosphere. *Id.* ¶ 16.

The Complaint asserts three claims for relief, seeking civil penalties and injunctive relief for violations of CAA Title VI and the Subpart F regulations. The first claim alleges that Schnitzer violated 40 C.F.R. § 82.155(b)(2) by failing to verify, in an appropriate signed

statement or contract, that refrigerant had been properly recovered from appliances accepted at its facilities. Compl. ¶¶ 18-56. Schnitzer collected "Hazardous Materials Compliance Contracts" ("HMCCs") for appliances accepted at these facilities, but they did not comply with the verification requirements in the regulations. *Id.* ¶¶ 18-51.

The second claim alleges that, during EPA's inspections, the agency found that two facilities had no refrigerant recovery system and no agreement with a third party to remove refrigerant. *Id.* ¶¶ 25-32. Schnitzer thus was not recovering refrigerant from appliances received at these facilities, as required by regulation. *Id.*

During these inspections, EPA also observed that some appliances were intact and still contained refrigerant. *Id.* ¶¶ 25-28, 29-32, and 48-51. Where a final processor has accepted small appliances or MVACs that still contain refrigerant, it must properly recover that refrigerant before recycling or other disposal. 40 C.F.R. § 82.155(b)(1). This claim alleges that Schnitzer failed to do so, in violation of 40 C.F.R. § 82.155(b)(1). Compl. ¶¶ 57-60.

The third claim alleges that Schnitzer violated the CAA recycling and emission reduction regulations at six facilities by accepting signed refrigerant recovery statements or contracts that it knew or had reason to know were false. *Id.* ¶¶ 61-64. During inspections, for example, EPA observed appliances for which Schnitzer had obtained statements or contracts asserting refrigerant had been recovered properly prior to delivery, where there were clear indicia that refrigerant had not been recovered properly, such as residual refrigerant or cut refrigerant lines. *See id.* ¶¶ 19-32, 37-39, 48-51 . Considering the obvious evidence to the contrary, Schnitzer knew or should have known that these statements or contracts were false, in violation of 40 C.F.R. § 82.155(b)(2)(i). Compl. ¶¶ 61-64.

##   II.   CONSENT DECREE

The proposed Consent Decree requires that Schnitzer pay a civil penalty of $1,550,000, plus interest, to resolve claims for past violations of CAA Title VI and its implementing regulations, take injunctive measures to promote compliance in the future, and perform a mitigation project to offset harmful effects of past violations.  CD ¶ 8.

The Decree's injunctive provisions require Schnitzer to develop and implement a refrigerant recovery management program ("RRMP") at all 40 of its facilities.  *Id.* § VI (Compliance Requirements).  Under the RRMP provisions, Schnitzer must (1) properly recover refrigerant from appliances, either at Schnitzer's facilities using the company's own refrigerant recovery systems, or offsite at a contractor's facility (*id.* ¶ 13(a)); (2) use trained employees to screen incoming appliances, to (a) ensure that appliances not containing refrigerant are accompanied by required documentation showing refrigerant had been properly recovered prior to delivery, (b) identify any signs of unlawful venting of refrigerants and notifying EPA, (c) if lacking sufficient documentation, clearly mark the appliance as actually or potentially containing refrigerant, and properly recovering such refrigerant, or (d) reject the appliance and document that rejection (*id.* ¶ 13(b)); (3) ensure that each accepted appliance that does not contain refrigerant is accompanied by a verification that all refrigerant had been recovered prior to delivery, under 40 C.F.R. § 82.155(a), either in a statement containing the name and address of the person who recovered the refrigerant and the date of recovery, or in a contract requiring the supplier to properly recover refrigerant prior to delivery or certify that the refrigerant had been properly recovered prior to receipt by the supplier, under 40 C.F.R. § 82.155(b)(2) (CD ¶ 13(c)); (4) develop a comprehensive training program encompassing management and employees at all

facilities, including instruction on stratospheric ozone depletion, statutes and regulations designed to protect the ozone layer, model verification statements and contracts, and proper screening and management of regulated scrap (*id.* ¶ 13(e)); (5) notify suppliers that refrigerant must be properly recovered prior to delivery under 40 C.F.R. § 82.155(a) (CD ¶ 13(d)); and (6) identify roles and responsibilities within Schnitzer's corporate structure for each aspect of the RRMP (*id.* ¶ 13(f)).

The Decree also requires that Schnitzer develop and implement a mitigation project to offset the harmful effects of past violations. CD § VI. Under these provisions, Schnitzer must completely destroy, under 40 C.F.R. § 82.3, all "R-12" refrigerant recovered from appliances at Schnitzer's facilities for five years after entry of the Decree. R-12 (a/k/a "CFC-12" or "Freon 12") contains the CFC dichlorodifluoromethane, which has one of the highest global warming potentials of any refrigerant, over 10,000 times that of $CO_2$. *See supra* n.1. R-12 was phased out of production and use in new appliances and vehicles in the mid-1990s, but older appliances and vehicles containing R-12 may remain in circulation until the end of their useful lives; therefore, they often end up at recycling facilities.[3] Such destruction, performed at only a few specialized disposal facilities in the United States, is the only method that ensures recovered refrigerant will not be released eventually to the atmosphere through equipment leaks or improper disposal.[4]

The Decree provides for the payment by Schnitzer of stipulated penalties in the event it fails to timely pay the civil penalty (CD ¶ 36), perform any of the required injunctive or

---

[3] EPA, "Refrigerant Transition & Environmental Impacts," currently available at www.epa.gov/mvac/refrigerant-transition-environmental-impacts.

[4] EPA (by ICF), "ODS Destruction in the United States and Abroad" § 4.2 (listing facilities), currently available at www.epa.gov/sites/default/files/2018-03/documents/ods-destruction-in-the-us-and-abroad_feb2018.pdf.

mitigation measures (*id.* ¶¶ 37-38), or comply with the Decree's reporting and recordkeeping requirements (*id.* ¶ 39).  *See id.* § X (Stipulated Penalties).

In return for Schnitzer's payments and performance of injunctive and mitigation measures, the Decree resolves all civil claims asserted in the United States' Complaint through the date of lodging of the Decree, subject to certain reservations of rights.  CD § XIV (Effect of Settlement / Reservation of Rights).

### III.  ARGUMENT

#### A.  Legal Standard for Approval of a Consent Decree

"[I]t is the policy of the law to encourage settlements."  *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 84 (1st Cir. 1990).  There is "a strong public policy in favor of settlements, particularly in very complex and technical regulatory contexts."  *United States v. Comunidades Unidas Contra la Contaminacion*, 204 F.3d 275, 280 (1st Cir. 2000) (citing *Conservation Law Found. of New England, Inc. v. Franklin*, 989 F.2d 54, 59 (1st Cir. 1993)).  "Moreover, such a policy has added bite where the settlement has been advanced for entry as a decree by a government actor 'committed to the protection of the public interest' and specially trained and oriented in the field."  *Comunidades Unidas*, 204 F.3d at 280 (citing *Cannons Eng'g Corp.*, 899 F.2d at 84)).

Considering this "strong public policy" in favor of settlements, a district court reviews a consent decree to ensure that it is both procedurally and substantively fair, reasonable, and consistent with the objectives of the underlying statute.  *City of Bangor v. Citizens Commc'n Co.*, 532 F.3d 70, 93-94 (1st Cir. 2008); *see Comunidades Unidas*, 204 F.3d at 279 ("There is no question that a consent decree must bear the imprimatur of a judicial judgment that it is fair,

adequate, reasonable, and consistent with the objectives of Congress.") (citation omitted). Although approval of a consent decree is a judicial act committed to the informed discretion of the district court, *City of Bangor*, 532 F.3d at 93-94, the court's role is a limited one. The relevant standard for the court's determination is "not whether the settlement is one which the court itself might have fashioned, or considers ideal, but whether the proposed decree is fair, reasonable, and faithful to the objectives of the government statute." *Cannons*, 899 F.2d at 84; *Harris v. Pernsley*, 654 F. Supp. 1042, 1049 (E.D. Pa. 1987) ("The Court may either approve or disapprove the settlement; it may not rewrite it."), *aff'd* 820 F.2d 592 (3d. Cir. 1987). The court's inquiry need not be all-encompassing and need not include protracted examination of the precise legal rights of the parties or resolve the merits of the claims. *Bragg v. Robertson*, 83 F. Supp.2d 713, 717 (S.D.W. Va. 2000); *accord Comunidades Unidas*, 204 F.3d at 281.

Not only should a district court's review of a consent decree be narrow in scope, it also "must defer heavily to the parties' agreement and the EPA's expertise." *United States v. Charles George Trucking, Inc.*, 34 F.3d 1081, 1085 (1st Cir. 1994). As the Supreme Court has stated:

> [S]ound policy would strongly lead us to decline . . . to assess the wisdom of the Government's judgment in negotiating and accepting the . . . consent decree, at least in the absence of any claim of bad faith or malfeasance on the part of the Government in so acting.

*Sam Fox Publ'g Co. v. United States,* 366 U.S. 683, 689 (1961). "The presumption in favor of settlement is particularly strong where a consent decree has been negotiated by the Department of Justice on behalf of a federal administrative agency specially equipped, trained or oriented in the field," such as EPA. *United States v. Cannons Eng'g Corp*, 720 F. Supp. 1027, 1035 (D. Mass. 1989), *aff'd*, 899 F.2d 79 (1st Cir. 1990). Accordingly, judicial review of a settlement

9

agreement negotiated by the government does not involve de novo evaluation of the settlement's merits or "second guessing" the Executive Branch's decision to enter into a proposed settlement. *Comunidades Unidas*, 204 F.3d at 280; *see Cannons*, 899 F.2d at 84 (courts should "refrain from second-guessing the Executive Branch"); *accord Sam Fox Publ'g Co.*, 366 U.S. at 689.  Rather, in reviewing a settlement involving a federal agency, the court "must exercise some deference to the agency's determination that settlement is appropriate."  *Conservation Law Found.*, 989 F.2d at 58 (citing *Federal Trade Comm'n v. Standard Fin. Mgmt. Corp.*, 830 F.2d 404, 408 (1st Cir. 1987)).  Moreover, there are compelling policy reasons to favor settlement in environmental cases.  *See In re Acushnet River & New Bedford Harbor*, 712 F. Supp. 1019, 1029 (D. Mass. 1989) ("Congressional purpose is better served through settlements which provide funds to enhance environmental protection, rather than the expenditure of limited resources on protracted litigation.").

   Deference should be granted to entry of a consent decree with the federal government because it is an official act of the Attorney General, who has "exclusive authority and plenary power to control the conduct of litigation in which the United States is involved, unless Congress specially authorizes an agency to proceed without the supervision of the Attorney General." *United States v. Hercules, Inc.*, 961 F.2d 796, 798 (8th Cir. 1992) (citing 28 U.S.C. § 516 and *FTC v. Guignon*, 390 F.2d 323, 324 (8th Cir. 1968)).  Thus, the Attorney General has considerable discretion to decide whether and on what terms to enter into a settlement.  *Hercules*, 961 F.2d at 798 (citing *Swift & Co. v. United States*, 276 U.S. 311, 331-32 (1928)); *Cannons*, 899 F.2d at 84; *see Kelley v. Thomas Solvent Co.*, 717 F. Supp. 507, 515-16 (W.D. Mich. 1989) ("the balancing of competing interests affected by a proposed consent decree [to which the

government is a party] 'must be left, in the first instance, to the discretion of the Attorney General'") (quoting *United States v. Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981)).

In sum, the Court's role in reviewing the proposed Consent Decree is limited. If the consent decree is fair, adequate, and reasonable, it should be approved without modification. In determining whether to approve the proposed Consent Decree, the Court should defer to EPA's expertise in protecting human health and the environment through implementation of the applicable Clean Air Act requirements, and to the Attorney General's expertise and discretion in conducting government litigation, assessing litigation risk, and determining whether settlement terms are in the public interest.

The proposed Consent Decree meets the requirements for district court approval, because it is fair, reasonable, and faithful to the objectives of the Clean Air Act.

### B. The Decree Is Reasonable, Fair, and Consistent with the Clean Air Act.

#### 1. *The Consent Decree is Fair.*

The fairness of a consent decree must be evaluated in both procedural and substantive aspects. *See Cannons*, 899 F.2d at 86 (explaining that "fairness in the … settlement context has both procedural and substantive components").

Procedural fairness demands that the parties negotiated at arm's length and in good faith. *United States v. Davis*, 261 F.3d 1, 23 (1st Cir. 2001); *Communidades Unidas*, 204 F.3d at 281. Procedural fairness is measured by the level of candor, openness, and bargaining balance involved in the negotiation process. *Cannons*, 899 F.2d at 86.

Substantive fairness is related to procedural fairness, because "[t]o the extent that the process was fair and full of 'adversarial vigor,' the results come before the court with a much

greater assurance of substantive fairness." *Cannons*, 899 F.2d at 87 n.4 (internal citation omitted). Substantive fairness derives from concepts of corrective justice and accountability: how much or how little should a settling party be expected to do or pay in order to correct environmental wrongs? *Communidades Unidas*, 204 F.3d at 281. Because these concepts are not easily quantified in environmental cases, EPA's expertise and conclusions receive "the benefit of doubt when weighing fairness." *Cannons*, 899 F.2d at 88; *see City of Bangor*, 532 F.3d at 97 ("Usually, there is deference to the EPA's judgment on fairness, and no independent court inquiry.").

The proposed Consent Decree resulted from procedurally fair settlement negotiations. The negotiations were conducted at arms-length during numerous discussions, culminating in the lodging with the Court of the proposed Consent Decree. Dkt. Nos. 2, 2-1. The parties engaged in extensive negotiations concerning the terms of the Consent Decree, including civil penalties, injunctive relief, and mitigation. Throughout the entirety of this process, each side was represented by experienced counsel proceeding in good faith. The Decree reflects the parties' careful and informed assessment of how to bring Defendants into compliance with the CAA.

Where, as here, a proposed consent decree is "the product of good faith, arms-length negotiations" it is "presumptively valid." *United States v. Oregon*, 913 F.2d 576, 581 (9th Cir. 1990) (citation omitted). Both the United States and Defendants will benefit from resolving the alleged violations without further costs and delays associated with litigation. *See United States v. Davis*, 261 F.3d 1, 26 (1st Cir. 2001) (noting that a consent decree may take into account "reasonable discounts for litigation risks, time savings, and the like that may be justified"). For these reasons, the Decree is procedurally fair.

The Consent Decree also is substantively fair. The Decree will correct Schnitzer's alleged noncompliance with CAA Title VI and its implementing regulations. The terms of the Decree are specifically designed to reduce emissions of refrigerants from Schnitzer's 40 metal recycling facilities located throughout the United States, which will protect the stratospheric ozone layer and limit the harmful effects of global warming. Implementation of the Decree's mitigation project will destroy all R-12 – one of the most potent ozone-depleting greenhouse gases – recovered from all of Schnitzer's facilities. The civil penalty and costs of injunctive relief will help deter Schnitzer and other companies from polluting the air and otherwise violating the CAA and its implementing regulations. The requirements that Schnitzer pay stipulated penalties for any noncompliance with the Decree will help deter violations and facilitate any necessary enforcement of the Decree. Moreover, the mitigation project will offset at least some of the harmful effect of Schnitzer's alleged past failures to comply with the CAA. Thus, because the Decree achieves corrective justice and accountability, it is substantively fair. *Communidades Unidas*, 204 F.3d at 281.

### 2. The Consent Decree is Reasonable.

The reasonableness of a proposed consent decree depends on how well the relief is "tailored" to redress the injuries alleged in the Complaint. *Comunidades Unidas*, 204 F.3d at 281. Courts need not examine the reasonableness of a proposed consent decree for "mathematical precision," but should defer to EPA's judgment that the decree is reasonable. *Davis*, 261 F.3d at 26. The reasonableness of a consent decree may be determined in light of whether it is technically adequate to cleanse the environment, compensates the public for the alleged violations, and accounts for the risks of litigation. *Cannons*, 899 F.2d at 89-90.

In assessing a decree's reasonableness, courts consider each provision in the context of the decree as a whole. *See, e.g., United States v. District of Columbia*, 933 F. Supp. 42, 51 (D.D.C. 1996); *United States v. Kerr-McGee Corp.*, No. 07-CV-01034, 2008 WL 863975, at *9 (D. Colo. Mar. 26, 2008).

In this case, the Decree is reasonable because it requires that Schnitzer take specific actions tailored to stop the violations alleged in the Complaint, help prevent them from recurring in the future, and mitigate harms from past violations. *Communidades Unidas*, 204 F.3d at 281. In doing so, the Decree will help reduce refrigerant emissions, protect the stratospheric ozone layer, and limit potential global warming. The Decree also compensates the public for the alleged violations, and provides specific and general deterrence, by requiring Defendants to implement effective injunctive measures estimated to cost over $1,744,000 and pay a civil penalty of $1,550,000, plus interest.

Settlement of this matter also reflects the parties' assessments of their relative litigation risks and promotes "the policy of the law to encourage settlements." *Cannons*, 899 F.2d at 84 (1st Cir. 1990); *see also Comunidades Unidas*, 204 F.3d at 280 (noting "the strong public policy in favor of settlements, particularly in very complex and regulatory contexts"). "It is almost axiomatic that voluntary compliance on an issue where there is potential disagreement is a better alternative than the uncertainty of litigation over that issue." *District of Columbia*, 933 F. Supp. at 51. The proposed Decree is a reasonable alternative to costly, protracted, and inherently risky litigation.

### 3. *The Consent Decree Advances the Goals of the Clean Air Act.*

The Decree advances the Clean Air Act's goals because it protects air quality and public health and welfare.

Congress passed the Clean Air Act "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b)(1). The Consent Decree furthers these objectives by requiring Schnitzer to take specific steps to comply with statutory and regulatory measures to protect the stratospheric ozone layer from the potential harm of refrigerant emissions. "Congressional purpose is better served through settlements which provide funds to enhance environmental protection, rather than the expenditure of limited resources on protracted litigation." *In re Acushnet River & New Bedford Harbor*, 712 F. Supp. 1019, 1029 (D. Mass. 1989). The proposed Decree is consistent with the CAA's goals, and the Court should enter it as a final judgment in this matter. *See Charles George Trucking*, 34 F.3d at 1085 (district court "must defer heavily to the parties' agreement and the EPA's expertise").

## IV. CONCLUSION

The Consent Decree requires Schnitzer to pay a civil penalty for past violations of the CAA Title VI and its implementing regulations, perform injunctive measures to reduce the likelihood of violations in the future, and implement a mitigation project to offset harm from past violations. The United States received no public comments on the Decree, and Schnitzer consented to the Decree's entry by the Court (CD ¶ 83). Because the Decree is fair, reasonable, and consistent with the goals of the CAA, the United States respectfully requests that the Court sign the Decree on page 33 and enter it as a final judgment.

Respectfully submitted,

TODD KIM
Assistant Attorney General
U.S. Department of Justice
Environment and Natural Resources Division

Dated: June 22, 2022

*/s/ David Laufman Weigert*
DAVID LAUFMAN WEIGERT
Senior Counsel
STEVEN A. KELLER
Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, DC  20044-7611
(202) 514-0133 (DLW)
(202) 514-5465 (SAK)
david.weigert@usdoj.gov
steve.keller@usdoj.gov

RACHAEL S. ROLLINS
United States Attorney
District of Massachusetts

MARY B. MURRANE
Chief, Civil Division
United States Attorney's Office
District of Massachusetts
John Joseph Moakley US Federal Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3100

OF COUNSEL:

DEBORAH CARLSON
Associate Regional Counsel
U.S. Environmental Protection Agency, Region 5
77 West Jackson Boulevard (Mail Code: C-14J)
Chicago, IL 60604-3507